IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| M.C., a minor by and through his parents<br>Pamela Crawford and John Mark Crawford,<br><br>          Plaintiff,<br><br>          v.<br><br>Dr. IAN AARONSON, Dr. JAMES AMRHEIN,<br>Dr. YAWAPPIAGYEI-DANKAH,<br>KIM AYDLETTE, MEREDITH WILLIAMS,<br>CANDICE "CANDI" DAVIS, MARY SEARCY,<br>and DOE #1, DOE #2, and DOE #3,<br>Unknown South Carolina Department of Social<br>Services Employees,<br>          Defendants. | CIVIL ACTION NO. 2:13-cv-01303-DCN<br><br>COMPLAINT |

## I. Preliminary Statement

1.      This lawsuit challenges the decision by government officials and doctors to perform an irreversible, painful, and medically unnecessary sex assignment surgery on a sixteen-month-old child in state custody. Defendants performed this surgery for the purpose of "assigning" the child the female gender despite their own conclusion that he "was a true hermaphrodite but that there was no compelling reason that she should either be male or female."

2.      Plaintiff M.C. is currently eight years old.  When M.C. was an infant, the South Carolina Department of Social Services ("SCDSS") took him into state care and custody because M.C.'s biological mother was deemed unfit and M.C.'s father was deemed to have abandoned him.  M.C.'s biological parents' rights were ultimately terminated.

1

3.    At birth, M.C. was identified as a male based on his external genitalia.  Shortly after birth, however, M.C.'s doctors discovered that M.C. had "ambiguous genitals" and both male and female internal reproductive structures.  As his medical records repeatedly indicated, M.C.'s doctors determined that he could be raised as either a boy or a girl.

4.    Despite not knowing whether M.C. would ultimately grow up to be a man or a woman, and whether he would elect to have any genital surgery, Defendants, who include doctors at a state hospital and SCDSS officials, decided to remove M.C.'s healthy genital tissue and radically restructure his reproductive organs in order to make his body appear to be female.

5.    Defendant doctors Aaronson, Amrhein, and Appiagyei-Dankah were primarily responsible for M.C.'s treatment during the time he was in the care of SCDSS. Despite the fact that M.C.'s condition did not threaten his health, the defendant doctors planned and decided to perform a "feminizing-genitoplasty" on the sixteen-month-old M.C.  During this surgery, Dr. Aaronson cut off M.C.'s phallus to reduce it to the size of a clitoris, removed one of M.C.'s testicles, excised all testicular tissue from M.C.'s second gonad, and constructed labia for M.C. The surgery eliminated M.C.'s potential to procreate as a male and caused a significant and permanent impairment of sexual function.

6.    M.C. was just under sixteen months old at the time of the surgery. The defendant doctors knew that sex assignment surgeries on infants with conditions like M.C.'s pose a significant risk of imposing a gender that is ultimately rejected by the patient.  Indeed, one of the doctor defendants who performed the surgery on M.C. had previously published an article in a medical journal wherein he recognized that "carrying out a feminizing-genitoplasty on an infant who might eventually identify herself as a boy would be catastrophic."

7.    Since a young age, M.C. has shown strong signs of developing a male gender. He

2

is currently living as a boy. His interests, manner and play, and refusal to be identified as a girl indicate that M.C.'s gender has developed as male. Indeed, M.C. is living as a boy with the support of his family, friends, school, religious leaders, and pediatrician.

8.     Defendants' decision to perform irreversible, invasive, and painful sex assignment surgery was unnecessary to M.C.'s medical well-being. Medical authority recognizes that children like M.C. may be assigned a gender of rearing independent of any surgery, meaning M.C. could have been raised as a girl or a boy until he was old enough for his gender identity to emerge. At that point, M.C. and his guardians could have made appropriate decisions regarding medical treatment—including whether to have any surgery at all.

9.     Defendants usurped these intimate and profound decisions from M.C. when he was barely older than an infant, knowing that surgically mis-assigning M.C.'s sex would lead to disastrous results. Unfortunately, medical technology has not devised a way to replace what M.C. has lost.

10.     By their actions, Defendants also interfered with M.C's future ability to form intimate, procreative relationships, choices central to his personal dignity and autonomy. Defendants decided to perform grossly invasive, painful, and irreversible feminizing-genitoplasty surgery on him, despite the fact that such surgery often sterilizes the individual, in many cases leaves the individual with limited or absent sexual response, and impairs the individual's ability to function sexually as the person might have chosen without surgery. Defendants' actions constituted an egregious, arbitrary, and enduring invasion of M.C.'s bodily integrity.

11.     Despite the fact that M.C. could have been raised as either a boy or a girl, Defendants rushed to perform a medically unnecessary, painful, and irreversible sex-assignment

3

surgery on a sixteen-month-old child.  Defendants permanently changed M.C.'s body, disregarding his physical and psychological well-being and causing M.C. irreparable injury.

12.     Acting under color of state law, Defendants violated M.C.'s substantive and procedural due process rights, including his fundamental rights to bodily integrity, procreation, liberty, and privacy, as guaranteed under the United States Constitution.  Through this suit, M.C., by and through his parents and legal guardians Pamela and John Mark Crawford, seeks to vindicate his rights and requests relief in the form of compensatory and punitive damages, as well as attorneys' fees and costs.

## II. Jurisdiction and Venue

13.     This action arises under 42 U.S.C. § 1983.

14.     This Court has jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts in suits to redress the deprivation of rights and privileges and immunities secured by the laws and Constitution of the United States, in this case the Fourteenth Amendment.

15.     Venue is proper in this District and the Charleston Division pursuant to 28 U.S.C. Section 1391(b)(2) and L.R. 3.01(A)(1) because a substantial part of the transactions or occurrences underlying Plaintiffs' claims occurred within the Charleston Division of this District, including a substantial part of the medical decision-making and the procedures which underlie Plaintiffs' claims.

## III.  Parties

16.     Plaintiff M.C. is an eight year old child and a current resident of Richland County, South Carolina.  He was born on November 20, 2004 in Greenville, South Carolina.

17.     Pamela Crawford ("Pam") and John Mark Crawford ("Mark") are M.C.'s

4

adoptive parents and legal guardians. They took custody of M.C. in August of 2006 and formally

adopted M.C. on December 11, 2006.  They are current residents of Richland County, South

Carolina. They bring this action in their representative capacity for the benefit of their son, M.C.,

and hereby apply to this Court for appointment as next friends or guardians *ad litem* of M.C. for

the purposes of this action.

18.    Defendant Ian Aaronson, upon information and belief, is, or was at all relevant

times hereto, a pediatric urologist and employee of the Medical University of South Carolina

("MUSC"), a medical facility located in Charleston County, South Carolina. MUSC is an agency

of the state of South Carolina. Defendant Aaronson is a resident of and/or maintains a medical

practice in Charleston, South Carolina. At all relevant times, MUSC provided medical treatment

to M.C. pursuant to the state's responsibility for his well-being and care. At all relevant times,

Defendant Aaronson provided medical care to M.C. pursuant to the state's responsibility for the

well-being and care of M.C. At all relevant times, Defendant Aaronson was acting under color of

state law. He is sued in his individual capacity.

19.    Defendant James Amrhein, upon information and belief, is, or was at all relevant

times hereto, a pediatric endocrinologist and employee of Greenville Hospital System, d/b/a

Greenville Memorial Hospital (hereinafter "Greenville Hospital"), a municipal hospital located

in Greenville County, South Carolina.  Greenville Hospital System operates numerous hospitals

and facilities, including Greenville Memorial Hospital. Defendant Amrhein is a resident of

and/or maintains a medical practice in Greenville County, South Carolina. At all relevant times,

Greenville Hospital provided medical treatment to M.C. pursuant to the state's responsibility for

his well-being and care.  Defendant Amrhein became involved in M.C.'s case in or about

February 2005 and was the primary doctor at Greenville Hospital overseeing M.C.'s treatment.

At all relevant times, Defendant Amrhein provided medical treatment to M.C. pursuant to the state's responsibility for the well-being and care of M.C. Defendant Amhrein remained involved in treatment-related decisions at least through the sex-assignment surgery performed on M.C. in April 2006. At all relevant times, Defendant Amhrein was acting under color of state law. He is sued in his individual capacity.

20.     Defendant Yaw Appiagyei-Dankah, upon information and belief, is, or was at all relevant times hereto, a pediatric endocrinologist and employee of MUSC, with its hospital facility located in County of Charleston, State of South Carolina. At all relevant times, Defendant Appiagyei-Dankah was a resident of and/or maintained a medical practice in Charleston County, South Carolina. MUSC is an agency of the State of South Carolina. At all relevant times, MUSC provided medical treatment to M.C. pursuant to the state's responsibility for his well-being and care. Defendant Appiagyei-Dankah became involved in M.C.'s case in or about January of 2006. At all relevant times, Defendant Appiagyei-Dankah provided medical treatment to M.C. pursuant to the state's responsibility for the well-being and care of M.C. Defendant Appiagyei-Dankah remained involved in treatment-related decisions at least through the sex-assignment surgery performed on M.C. in April 2006. At all relevant times, defendant Appiagyei-Dankah was acting under color of state law. He is sued in his individual capacity.

21.     Defendant Kim Aydlette was the Director of the South Carolina Department of Social Services from 2003 through at least August of 2006. SCDSS is an agency of the state of South Carolina, with offices located statewide and its main office in Columbia, Richland County, South Carolina. SCDSS is charged with protecting the safety and well-being of children, who, like M.C, are entrusted to its care and custody. SCDSS retained legal custody of M.C. and had the authority to make all medical decisions for M.C. from February 16, 2005, the date of the *ex*

*parte* order removing M.C. from his biological parents, until December 11, 2006, the date that he was adopted, and at all times relevant to the claims in this case.   Defendant Aydlette was statutorily "vested with the duty and authority to oversee, manage, and control the operation, administration, and organization of the department, subject only to the laws of this State and the United States." S.C. CODE ANN. § 43-1-50 (1993). Pursuant to SCDSS policy, any significant medical decision for a child in SCDSS custody required Defendant Aydlette's authorization. She is sued in her individual capacity.

22.     Defendant Meredith Williams was a SCDSS employee supervising M.C.'s case. She was responsible for the oversight of M.C.'s case, including his safety and well-being while he was in state custody. She participated in making and carrying out the treatment plan that caused M.C.'s sex assignment surgery.  Upon information and belief, she instructed M.C.'s foster mother to physically deliver him to the hospital to undergo the sex assignment surgery. She is sued in her individual capacity.

23.     Defendant Candice "Candi" Davis was a SCDSS employee assigned to M.C.'s case and was his adoption caseworker. She was responsible for the oversight of M.C.'s case, including his safety and well-being while he was in state custody. She participated in making and carrying out the treatment plan that caused M.C.'s sex assignment surgery.   Upon information and belief, she instructed M.C.'s foster mother to physically deliver him to the hospital to undergo the sex assignment surgery. She is sued in her individual capacity.

24.     Defendant Mary Searcy was a SCDSS employee involved in M.C.'s case and responsible for his safety and well-being while he was in state custody. On or about April 17 and 18, 2006, she provided the necessary SCDSS consent for M.C.'s sex assignment surgery. She is sued in her individual capacity.

7

25.     Defendant Doe #1 is or was at all relevant times hereto, a caseworker for, and employee of, SCDSS. Upon information and belief, at all relevant times, Defendant Doe #1 was entrusted with M.C.'s well-being and care while M.C. was in state custody and participated in making and carrying out the treatment plan that caused M.C.'s sex assignment surgery. Defendant Doe #1 is the unnamed SCDSS case worker recorded in M.C.'s medical records as having met with Defendant Appiagyei-Dankah on January 18, 2006. Doe #1's name is currently unknown to Plaintiff. Defendant Doe #1 is sued in his or her individual capacity.

26.     Defendant Doe #2 is or was at all relevant times hereto, a caseworker for, and employee of, SCDSS. At all relevant times, Defendant Doe #2 was entrusted with M.C.'s well-being and care while M.C. was in state custody and participated in making and carrying out the treatment plan that caused M.C.'s sex assignment surgery. Defendant Doe #2 is the unnamed SCDSS case worker recorded in M.C.'s medical records as having met with Defendant Aaronson on January 18, 2006. Doe #2's name is currently unknown to Plaintiff. Defendant Doe #2 is sued in his or her individual capacity.

27.     Defendant Doe #3 is or was at all relevant times hereto, a caseworker for, and employee of, SCDSS. At all relevant times, Defendant Doe #3 was entrusted with M.C.'s well-being and care while M.C. was in state custody and participated in making and carrying out the treatment plan that caused M.C.'s sex assignment surgery. Defendant Doe #3 is the unnamed SCDSS case worker recorded in M.C.'s medical records as having met with Defendant Aaronson on February 27, 2006. Doe #3's identity is currently unknown to Plaintiff. Defendant Doe #3 is sued in his or her individual capacity.

28.     The Defendants identified in paragraphs 21-27 above are collectively identified in this Complaint as "Defendant SCDSS Officials."

8

## IV. Background on Differences of Sexual Development

29.     Moments after a child is born, a physician visually identifies the newborn's genitalia and records the newborn's sex as "male" or "female" on that basis.  Biological sex is determined by a number of different physiological factors, including chromosomes, gonads, hormones, and genitalia, although it is commonly generally understood to be as simple as the appearance of the external genitals.  Usually a determination of an infant's biological sex is uneventful. Eventually, children develop a gender identity, meaning that their brains identify with a particular gender—a sense of who they are inside.

30.     The combined trajectory of biological sex and gender identity is commonly assumed, yet accepted medical standards recognize that gender identity develops independently from external genitalia or other markers of biological sex. There is no definitive consensus on what determines gender identity beyond the fact that this determination occurs within an individual's brain.  Gender identity develops over time—the physical aspects visible at birth are not determinative.

31.     An estimated one in 2,000 babies is born with reproductive or sexual anatomy that does not fit typical definitions of male or female—a higher incidence than Down syndrome or cystic fibrosis.  These infants' physiology is not easily classifiable as male or female. The chromosomes, gonads, internal reproductive system and/or genitalia develop in an atypical pattern.  The conditions that cause these variations are sometimes grouped under the terms "intersex" or "DSD" (Differences/Disorders of Sex Development).  The medical condition M.C. was born with is ovotesticular DSD, also referred to in medical literature and M.C.'s records as "true hermaphroditism."

9

32.     When a child is born with mixed or ambiguous markers of biological sex, standard medical practice is to assign a sex that is most likely to match the child's gender identity.  However, with many intersex conditions, including ovotesticular DSD, it is impossible to predict with certainty what gender identity will develop.  Current standards of care regard the initial sex assignment as provisional, and recommend correcting the sex designation later if the prediction of future gender identity turns out to be incorrect.  Recognizing that sex assignment presents a life-changing decision, doctors have typically suggested that adults seeking sex assignment surgery undergo psychotherapy beforehand so that these individuals are both psychologically and practically prepared for this profound step.

33.     Irreversible surgical alteration of the genitals and reproductive organs of infants born with intersex conditions, undertaken to create a more typically male or typically female appearance, may reduce or eliminate reproductive capacity and almost always result in significant reduction of sexual function.  Sometimes, individuals subjected to childhood sex assignment surgery end up identifying with a gender that does not correspond to the surgical assignment.  Even in circumstances where the individual ultimately identifies with the gender the doctors attempted to assign, they have been forced to undergo an extraordinarily invasive, nonconsensual genital restructuring. Current standards of care recognize that children with intersex conditions can be raised as boys or girls without early genital surgery, and that surgery may be postponed until the gender identity has emerged and the patient can decide whether to undergo procedures that risk infertility and the elimination of sexual sensation.

### V. Factual Background

***Social Services Takes Custody of M.C. Shortly After His Birth***

34.     M.C. was born on November 20, 2004, along with a twin sister.  M.C. and his

10

sister were born premature, each weighing less than two pounds at birth. M.C.'s twin eventually passed away a few months after birth.

36. Due to medical complications concerning M.C.'s premature birth and acid reflux (unrelated to his intersex condition), he remained in the hospital for approximately two and a half months after birth.

36. Shortly after M.C.'s birth, SCDSS began an investigation into possible neglect by M.C.'s biological parents. According to a December 7, 2004 SCDSS report, M.C.'s biological mother rarely visited him or his twin in the hospital and was difficult to reach by telephone to obtain consent for medical procedures. SCDSS notes indicate that SCDSS officials believed that both biological parents posed substantial risk of physically neglecting M.C.

37. On February 8, 2005, M.C. was released from the hospital into his biological parents' care. Just one week later, his biological parents notified SCDSS that they wanted to relinquish their parental rights. M.C.'s biological parents had earlier given SCDSS written permission to access his medical records.

38. SCDSS then pursued an *ex parte* order to remove M.C. from the custody of his biological parents. On February 16, 2005, a court ordered that custody of M.C. be placed with SCDSS. About six months later, SCDSS filed a termination of parental rights complaint. The court terminated M.C.'s biological parents' parental rights on September 9, 2006.

39. Until his adoption in 2006, M.C. lived with two different foster families. Pursuant to state law, however, SCDSS retained legal custody of M.C. while he was in foster care. SCDSS officials made decisions whether to authorize medical treatment, including the sex assignment surgery, prepared paperwork necessary to implement the sex assignment treatment plan, and instructed the foster family at the time to deliver M.C. to the hospital at which the sex

assignment surgery was performed. SCDSS retained the authority to make all medical decisions for M.C. from February 16, 2005, the date of the *ex parte* order removing M.C. from his biological parents, until December 11, 2006, the date that he was adopted.

### M.C.'s Diagnosis of Ovostesticular DSD

40.    M.C. was born with a condition called ovotesticular DSD (Difference/Disorder of Sex Development). Previously referred to as "true hermaphroditism," ovotesticular DSD is characterized by the presence of both ovarian and testicular tissue.

41.    M.C.'s doctors identified him as male in both the labor and delivery summary and the newborn identification form.  He was born with a testicle, an ovotestis (a gonad with both ovarian and testicular tissue), and other male and female internal reproductive structures.  The medical record of M.C. at birth noted that his "phallus was rather large," measuring approximately 1.5 to 2 centimeters in length.  Routine blood tests indicated that M.C.'s testosterone levels were "extremely elevated."  Subsequent medical records note that the M.C. was born with small vaginal opening below a "significant" phallus, with a "scrotalized" labia.

42.    For most of M.C.'s first year of life, his doctors were not certain of his sex.  In his early medical records, the medical professionals treating him referred to him sometimes as male and sometimes as female.  They performed multiple tests to determine hormone levels and the presence of internal sex organs.  On April 26, 2005, when M.C. was about six months old, Dr. Michael Gauderer performed surgery on M.C. related to M.C.'s acid reflux condition at Greenville Hospital.  During the surgery, Dr. Gauderer performed exploratory surgery to inspect M.C.'s internal sex organs.  His medical report indicates that M.C. had "ambiguous" genitalia, and that one gonad most closely resembled an ovary and the other gonad most closely resembled

a testis.

43.    In a letter to M.C.'s pediatrician dated October 5, 2005, Defendant Amrhein, who had become involved in M.C.'s case earlier that February, described M.C.'s DSD as "confusing."  In the letter, he noted that M.C. had a vagina and perhaps a uterus, but that M.C. also had "a 3.0 cm well-developed phallus" and "scrotalized labia," and that M.C.'s testosterone levels were "extremely elevated."  Defendant Amrheim noted that despite his intersex condition, M.C. "continue[d] to do well with no specific concerns or problems."

44.    On October 11, 2005, Dr. Gauderer performed a second surgery on M.C. at Greenville Hospital.  He biopsied M.C.'s internal sex organs, and attempted to rearrange M.C.'s reproductive organs by moving the ovotestis up into the abdominal cavity and the testicle down into the labia majora.  The notes from that surgery indicated that M.C. had a "short vagina, absent uterus, normal infantile left testis, and a right ovotestis."

*Defendant Doctors' Decision to Perform Medically Unnecessary Sex Assignment Surgery on M.C.*

45.    Following the biopsy performed by Dr. Gauderer, Defendant Amrhein wrote to M.C.'s pediatrician, stating that in his opinion, M.C. was a "true hermaphrodite."  Defendant Amrhein further opined that a decision needed to be made regarding M.C.'s gender of rearing and "surgical correction."  Having decided that M.C. needed "surgical correction," Defendant Amrhein referred his case to Defendants Aaronson, the surgeon who ultimately performed the sex assignment surgery, and Defendant Appiagyei-Dankah, a pediatric endocrinologist at MUSC.  Defendant Aaronson, Appiagyei-Dankah, and Amrhein collaborated to ultimately decide to perform the sex assignment surgery. At no time did any doctor request an ethics

consult to determine whether the surgery was in M.C.'s best interest.

46.    Over the next six months, from January to May 2006, Defendants Aaronson and Appiagyei-Dankah examined M.C. at MUSC several times and discussed his condition amongst themselves, sometimes with involvement of SCDSS employees.  Having examined M.C., Defendants Aaronson, Appiagyei-Dankah, and Amrhein all concurred that there was no compelling biological reason to raise M.C. as either male or female.  This view is noted in the following medical records:

    a.    January 18, 2006: "Due to the nature of [M.C.'s] external genital anatomy, either sex of rearing is possible with appropriate surgery." [Defendant Appiagyei-Dankah's progress notes].

    b.    January 18, 2006: "I was… able to reassure both her social worker and adoptive [sic] mother that as far as the external genitalia are concerned, this can be corrected surgically so that the baby looks either a normal boy or girl" [Letter from Defendant Aaronson to Defendant Amrhein].

    c.    February 27, 2006: "[C]urrently she could be potentially raised, surgically reconstructed, and treated to be male or female." [Defendant Appiagyei-Dankah's progress notes]

    d.    February 27, 2006: "[M]y bias at the moment is towards female, although I have raised the possibility, because of the substantial virilization of the external genitalia, that there may have been sufficient testosterone imprinting to question ultimate gender identity." [Defendant Appiagyei-Dankah's progress notes].

    e.    December 27, 2006: "Dr. Appiagyei noted that this was a case of 'true hermaphroditism' and he ordered additional lab work.  Dr. Aaronson concurred that this was a true hermaphrodite but that there was no compelling reason that she should be either male or female—the decision was made to raise her as female.  On April 17th, 2006 she had preoperative labwork and was admitted for surgery on April 18th, 2006." [Developmental Pediatric Evaluation].

47.    Defendant Aaronson's notes indicate that he was aware that M.C.'s exposure to high levels of testosterone ("testosterone imprinting") could affect M.C.'s ultimate gender

identification.  In a letter to Defendant Amrhein, which copied Defendant Appiagyei-Dankah,

Defendant Aaronson stated that "because of the substantial virilization of the external genitalia,

that there may have been testosterone imprinting to question ultimate gender identity."

Defendant Aaronson was also aware that the effects of performing irreversible feminizing

surgery on a child who might ultimately identify as a boy would be devastating.  In fact,

Defendant Aaronson had earlier published an article in a medical journal where he recognized

that "carrying out a feminizing genitoplasty on an infant who might eventually identify herself as

a boy would be catastrophic."[1]

48.     No medical standard exists to determine the gender of a child with M.C.'s

condition, particularly at such an early age. Defendants Amrhein, Aaronson and Appiagyei-

Dankah knew they could not predict whether the child's gender would develop as male or

female.

49.     Despite knowing that they could assign M.C. a gender of rearing and postpone

surgery, and that they could not reasonably predict whether M.C. would ultimately identify as a

man or a woman, Defendants Aaronson, Appiagyi-Dankah, and Amrhein formed the treatment

team that ultimately urged SCDSS officials that M.C. undergo sex assignment surgery in order to

make his body appear female.  The recommendation to SCDSS officials that they authorize sex

assignment surgery was made jointly by Defendants Aaronson, Appiagyei-Dankah, and

Amrhein, with each doctor contributing based on his area of specialization.

50.     In urging that sex assignment surgery for M.C., Defendants Aaronson, Appiagyei-

Dankah, and Amrhein knew of the irreversible nature of the surgery and its severe risks, which

---

[1] Ian A. Aaronson, *The Investigation and Management of the Infant with Ambiguous Genitalia: A Surgeon's Perspective*, 31 Curr. Probl. Pediat. 168 (2001).

include complete loss of sexual function, scarring, loss of male fertility, gender misassignment, and lifetime psychological distress.

***Medically Unnecessary Sex Assignment Surgery is Performed on M.C.***

51. On April 18, 2006, with SCDSS authorization, Defendant Aaronson surgically removed the majority of M.C.'s phallus, calling it a "reduction clitoroplasty." He also removed M.C.'s one functioning testicle and most, if not all, of the testicular tissue in M.C.'s other gonad.

52. There was no medical necessity to perform sex assignment surgery on M.C. as a sixteen-month-old child. There was no medical reason why surgery could not be postponed until M.C.'s gender emerged. M.C.'s condition had no negative impact on his physical well-being at the time and M.C. could have been raised as female or male without immediate genital surgery. Defendants' actions caused emotional trauma, stress, physical pain and confinement, and loss of bodily integrity, permanently impacted M.C.'s potential to function sexually and permanently destroyed M.C.'s potential male reproductive function.

53. Defendants Aaronson, Amrhein, and Appiagyei-Dankah's actions deprived M.C. of the opportunity to delay the decision regarding which sexual surgeries to have until after M.C.'s dominant gender characteristics emerged. They deprived M.C. of the ability to make the very personal decision of which genital surgeries, if any, he wanted.

54. At no relevant time did Defendants Aaronson, Appiagyi-Dankah, and Amrhein request or initiate a hearing before taking action to terminate M.C.'s protected liberty interests in bodily integrity, privacy, and procreation. Defendants Aaronson, Appiagyi-Dankah, and Amrhein knew no such hearing had taken place prior to the decision to proceed with the sex assignment surgery.

16

*Defendant South Carolina Department of Social Services Officials Authorize M.C.'s*

*Unnecessary Sex Assignment Surgery*

55.    SCDSS retained custody of M.C. and had the authority to make all medical decisions for him from February 16, 2005, the date of the ex-parte order removing him from his biological parents, until December 11, 2006, the date that he was adopted.

56.    Defendant Meredith Williams, Defendant Mary Searcy, Defendant Candice "Candi" Davis,  and Defendants Doe #1, Doe #2, and Doe #3, the SCDSS employees responsible for M.C's  care and well-being, attended M.C.'s medical appointments at various points during the time when it was decided that M.C. undergo sex assignment surgery .

57.    Defendants Williams and Davis, along with Defendants Does #1, #2, and #3 received multiple communications from the defendant doctors regarding the recommended sex assignment treatment plan for M.C. Upon information and belief, Defendant Williams, Defendant Davis, Defendant Doe #1, Defendant Doe #2, and Defendant Doe #3 participated in making the decision to authorize the sex assignment surgery and to implement the sex assignment treatment plan, coordinated the logistical steps needed to implement the plan (including, but not limited to, coordinating transport and M.C.'s appointment times with the foster mother, and the completion of necessary paperwork) and provided the requisite "Checklist of Necessary Information" that described the sex assignment surgery to be approved by Defendant Aydlette.

58.    As part of the implementation, Defendants Davis and Williams directed M.C.'s foster parents to deliver M.C. to the hospital for the sex assignment surgery.

59.    SCDSS authorization for the sex assignment surgery was given to Defendant Aaronson's surgical nurse via telephone, by SCDSS social worker Defendant Mary Searcy.

60.     Defendants Williams, Davis, Searcy, Doe #1, Doe #2, and Doe #3 knew that the proposed treatment plan was a sex assignment surgery, and that it included the removal of healthy genital tissue that could result in sterilization. At no relevant time did Defendants Davis, Williams, Searcy, Doe #1, Doe #2, or Doe #3 request or initiate a hearing before taking action to terminate M.C.'s protected liberty interests in bodily integrity, privacy, and procreation. Defendants Davis, Williams, Searcy, Doe #1, Doe #2, and Doe #3 knew no such hearing had taken place prior to the decision to proceed with the sex assignment surgery.

61.     SCDSS policy, effective September 2, 2003, required Defendant Aydlette's signature for any "major surgery" requiring in-patient hospitalization.  Among other items in a "Check List of Necessary Information" to be attached to the request for consent included the following:

a.     "Nature of the proposed medical procedure (in non-medical English);"
b.     "Significant risks presented by the procedure;"
c.     "Why the doctor believes the procedure is needed, and the anticipated result of the procedure;" and
d.     "Physician's/hospital's consent forms (if applicable)."

Upon information and belief, Defendant Aydlette signed the request for consent, thus allowing the surgery.  In signing, Defendant Aydlette was aware of the nature of the surgery, including that the elimination of male sexual and reproductive ability and removal of reproductive organs and would terminate and severely interfere with M.C.'s protected liberty interests in procreation, privacy, and bodily integrity. Despite this, Defendant Aydlette did not request or initiate notice or a hearing before taking action to terminate M.C.'s protected liberty interests in bodily integrity, privacy, and procreation.  Defendant Aydlette knew no such hearing had taken place

18

prior to the decision to proceed with the sex assignment surgery.

62.    The Defendant SCDSS Officials' actions deprived M.C. of the opportunity to delay the decision regarding which sexual surgeries to have until after M.C.'s dominant gender characteristics emerged.  They deprived M.C. of the ability to make the very personal decision of which genital surgeries, if any, he wanted.

63.    The Defendant SCDSS Officials subjected M.C., or permitted M.C. to be subjected to, a painful and medically unnecessary sex assignment surgery that altered M.C.'s body and permanently limited M.C.'s ability to procreate and function sexually.

*M.C.'s Current Situation*

64.    In June 2006, two months after the sex assignment surgery, Pam Crawford and Mark Crawford saw M.C.'s profile on the State of South Carolina's child adoption website. Mrs. Crawford expressed her interest in adopting M.C. and learned about his condition.  Based on her familiarity with the negative effects of these surgeries through the experience of a childhood friend, Mrs. Crawford called the agency and clearly expressed the family's desire not to subject M.C. to unnecessary sex assignment surgery.  Unfortunately, the surgery had already been completed.  Mr. and Mrs. Crawford gained custody of M.C. in August 2006, and legally adopted him on December 11, 2006.

65.    Mr. and Mrs. Crawford initially raised M.C. as a female in accordance with the gender of rearing.  However, he has always shown strong signs of developing a male gender. His interests, manner and play, and refusal to be identified as a girl indicate that M.C.'s gender has developed as male.  Indeed, M.C. is living as a boy with the support of his family, friends, school, religious leaders, and pediatrician.

## VI. Causes of Action

### COUNT ONE:
### Fourteenth Amendment Substantive Due Process; 42 U.S.C. § 1983
(as against Defendant Doctors Aaronson, Amrhein, Appiagyei-Dankah, and Defendant Meredith Williams, Defendant Mary Searcy, Defendant Candice "Candi" Davis, Defendant Kim Aydlette, and Defendants Doe #1, Doe #2, and Doe #3)

66.     Plaintiff incorporates all preceding paragraphs of the Complaint as if fully stated herein.

67.     The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

68.     On April 18, 2006, Defendant Aaronson surgically removed the majority of M.C.'s phallus, calling it a "reduction clitoroplasty."  He also removed M.C.'s one functioning testicle and most, if not all, of the testicular tissue in M.C.'s other gonad.

69.     Throughout M.C.'s time under the care of SCDSS, Defendant Aaronson, Defendant Amrhein, and Defendant Appiagyei-Dankah developed a treatment plan for M.C.'s care relating to his intersex condition. Defendants Amrhein and Appiagyei-Dankah were pediatric endocrinologists and Defendant Aaronson a pediatric urologist. Each examined M.C. and, with each contributing recommendations and observations according to each doctor's area of medical expertise, worked with the other two to determine M.C.'s course of treatment.

70.     The decisions to assign the female sex and to recommend the sex assignment surgery was made jointly between Defendant Aaronson, Defendant Amrhein, and Defendant Appiagyei-Dankah, and all three urged SCDSS officials to approve the surgery.

71.     Given that the removal of M.C.'s phallus and potential sterilization was not medically necessary, caused significant physical pain, imposed unreasonable risks of future

20

physical and mental pain and suffering, and deprived M.C. of the opportunity to make his own deeply intimate decisions about whether to undergo genital surgery, if any, when he reached maturity, Defendants Aaronson, Amrhein, and Appiagyei-Dankah's actions were an intentional and egregious invasion of M.C.'s rights to bodily integrity, privacy, and procreation that shock the conscience. In taking these actions, Defendants Aaronson, Amrhein, and Appiagyei-Dankah acted unreasonably and inflicted harm on M.C. without justification.

72.     Defendants Aaronson, Amrhein, and Appiagyei-Dankah acted under color of state law and unreasonably violated Plaintiff's substantive due process rights to bodily integrity, privacy, procreation, and liberty, in violation of the Fourteenth Amendment of the United States Constitution.

73.     Defendant Kim Aydlette, upon information and belief, signed the medical consent form required under SCDSS policy in order for surgery to be performed on M.C. Authorizing a procedure that removed M.C.'s phallus and removed his male reproductive ability was an intentional and egregious invasion of M.C.'s rights to bodily integrity, privacy, and procreation that shocks the conscience. In taking this action, Defendant Aydlette acted unreasonably and inflicted harm upon M.C. without justification.

74.     Defendant Aydlette acted under color of state law when she knowingly permitted medically unnecessary sex assignment surgery on M.C., a child entrusted to her care and custody, violating Plaintiff's substantive due rights to bodily integrity, procreation, privacy and liberty, in violation of the Fourteenth Amendment of the United States Constitution.

75.     Defendant Meredith Williams, Defendant Mary Searcy, Defendant Candice "Candi" Davis, Defendant Doe #1, Defendant Doe #2, and Defendant Doe #3 were responsible for M.C., including his safety and well-being, while M.C. was in state custody. Defendant

Williams, Defendant Davis, Defendant Doe #1, Defendant Doe #2, and Defendant Doe #3 participated in making and carrying out the treatment plan that caused M.C.'s sex assignment surgery. Defendant Searcy provided SCDSS consent over the phone to enable the sex assignment surgery to take place.

76.     Implementing and consenting to the treatment plan for a surgery that ultimately removed M.C.'s phallus and potentially sterilized him was an intentional and egregious invasion of M.C.'s rights to bodily integrity, privacy, and procreation that shocks the conscience. In taking these actions, Defendants Williams, Davis, Searcy, Doe #1, Doe #2, and Doe #3 acted unreasonably and inflicted harm upon M.C. without justification.

77.     By participating in and implementing the treatment plan for medically unnecessary sex assignment surgery, Defendants Williams, Davis, Searcy, Doe #1, Doe #2, and Doe #3 acted under color of state law and unreasonably violated Plaintiff's substantive due rights to bodily integrity, procreation, privacy, and liberty, in violation of the Fourteenth Amendment of the United States Constitution.

<u>**COUNT TWO:**</u>
**<u>Fourteenth Amendment Procedural Due Process; 42 U.S.C. § 1983</u>**
(as against Defendant Doctors Aaronson, Amrhein, Appiagyei-Dankah, and Defendant Meredith Williams, Defendant Mary Searcy, and Defendant Candice "Candi" Davis, Defendant Kim Aydlette, and Other Unknown SCDSS Employees)

78.     Plaintiff incorporates all preceding paragraphs of the Complaint as if fully stated herein.

79.     The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

80.     Knowing that their plan of treatment, including the sex assignment surgery, would

result in the elimination of M.C.'s male reproductive capacity and sexual function, Defendant

Aaronon, Defendant Amrhein, and Defendant Appiagyei-Dankah did not request, initiate, or

inquire about a pre-deprivation hearing before taking action to terminate M.C.'s protected liberty

interests in bodily integrity, privacy, and procreation. They knew that no hearing had taken place

at the time the surgery was performed.

81.     There was no compelling reason, medical or otherwise, to perform the surgery

that resulted in the removal of M.C.'s phallus and corresponding potential sterilization, causing

significant physical pain, imposing unreasonable risks of future physical and mental pain and

suffering, and depriving M.C. of the opportunity to make his own deeply intimate decisions

about whether to undergo genital surgery, if any, when he reached maturity,

82.     In choosing to perform the surgery and potential sterilization without requesting,

initiating, or inquiring as to a pre-deprivation hearing, Defendants Aaronson, Amrhein, and

Appiagyei-Dankah acted under color of state law and unreasonably violated Plaintiff's

procedural due process rights to bodily integrity, privacy, procreation, and liberty, in violation of

the Fourteenth Amendment of the United States Constitution.

83.     Defendants Aaronson, Amrhein, and Appiagyei-Dankah's violations of M.C.'s

Fourteenth Amendment rights to procedural due process were without reasonable justification

and were not in service of any legitimate government interest.

84.     Defendant Aydlette, upon information and belief, signed the medical consent

form required under SCDSS policy in order for surgery to be performed on M.C. At no time did

Defendant Aydlette request, initiate, or inquire about a pre-deprivation hearing before taking

action to terminate M.C.'s protected liberty interests in bodily integrity, privacy, and procreation.

Defendant Aydlette knew that no such hearing had taken place at the time she authorized the

surgery.

85.     By authorizing the procedure that removed M.C.'s phallus and potentially sterilized him without first initiating, requesting, or inquiring about a hearing, Defendant Aydlette acted unreasonably, without any justification, and not in service of any legitimate government interest.

86.      Defendant Aydlette acted unreasonably and under color of state law when she knowingly permitted medically unnecessary sex assignment surgery on M.C. to take place without a pre-deprivation hearing, violating Plaintiff's Fourteenth Amendment rights to procedural due process.

87.     Defendant Meredith Williams, Defendant Mary Searcy, Defendant Candice "Candi" Davis, and Defendants Doe #1, Doe #2, and Doe #3 were responsible for M.C., including his safety and well-being, while M.C. was in state custody. Defendants Williams, Davis, Doe #1, Doe #2, and Doe #3 participated in making and implementing the treatment plan that caused M.C.'s sex assignment surgery.  Defendant Searcy provided the oral consent, over the phone, on the date of the surgery. In taking these actions, neither Defendants Williams, Searcy, Davis, Doe #1, Doe #2, nor Doe #3 requested, initiated, or inquired as to a pre-deprivation hearing before taking action to terminate M.C.'s protected liberty interests in bodily integrity, privacy, and procreation. Defendants Williams, Searcy, Davis, Doe #1, Doe #2, and Doe #3 knew no such hearing had been held prior to the sex assignment surgery.

88.     By knowingly permitting medically unnecessary sex assignment surgery on M.C. to take place without a pre-deprivation hearing, Defendants Williams, Searcy, Davis, Doe #1, Doe #2, and Doe #3 violated Plaintiff's procedural due rights to bodily integrity, procreation, privacy, and liberty, in violation of the Fourteenth Amendment of the United States Constitution.

24

89.    In violating M.C.'s Fourteenth Amendment rights to procedural due process, all Defendant SCDSS Officials acted unreasonably and inflicted harm upon M.C. without justification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff M.C. respectfully prays that this Court enter judgment in his favor and against Defendants, providing the following relief:

90.    A declaration that Defendants have violated M.C.'s rights.

91.    Compensatory damages in an amount to be determined at trial adequate to compensate the plaintiff for his harms and losses, together with an award of punitive damages in an amount to be determined at trial.

92.    For interest, where appropriate, on any damages awarded to Plaintiff.

93.    Attorneys' fees, expenses, and costs incurred in the prosecution of this action pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws.

94.    For any other relief as the Court deems just and proper.


Dated:        May 14, 2013                    Respectfully submitted,

                                              /s/Kenneth M. Suggs
                                              Kenneth M. Suggs (Fed. I.D. 3422)
                                              Janet, Jenner & Suggs, LLC
                                              500 Taylor Street, Suite 301
                                              Columbia, SC 29201
                                              (803) 726-0050
                                              *ksuggs@myadvocates.com*

*On behalf of Attorneys for Plaintiff*

Anne Tamar-Mattis*
ADVOCATES FOR INFORMED CHOICE
P.O. Box 676
Cotati, CA  94931
(707) 793- 1190
*director@aiclegal.org*

John Lovi*
William Ellerbe*
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506 3900
*jlovi@steptoe.com*
*wellerbe@steptoe.com*

Alesdair H. Ittelson*
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
(334) 956-8200
*alesdair.ittelson@splcenter.org*

Kristi L. Graunke*
SOUTHERN POVERTY LAW CENTER
233 Peachtree St. NE, Suite 2150
Atlanta, GA 30303
(404) 521-6700
*kristi.graunke@splcenter.org*

\* Applications for *pro hac vice* admission forthcoming